CROSSROADS HOSPICE OF KANSAS CITY )
14310 East 42nd Street, Unit 600 )
Independence, MO 64055 )
  )
         PLAINTIFF, )
  )
v. )
  )
XAVIER BECERRA, Secretary )
United States Department of ) Civil No. 4:24-cv-00813
Health and Human Services, )
200 Independence Avenue, S.W. )
Washington, DC  20201, )
  )
         DEFENDANT. )
  )
  )
  )

## COMPLAINT

## INTRODUCTION

1.      Crossroads Hospice of Kansas City, Medicare Provider No. 1427093988, ("Plaintiff" or "Crossroads"), by and through its counsel, appeals final action taken by the Secretary of the Department of Health and Human Services ("Secretary"), acting through an Administrative Law Judge ("ALJ"), that violates applicable law regarding (i) payment for hospice services provided to Medicare beneficiaries and (ii) application of statistical sampling and extrapolation  in calculation of an alleged overpayment amount.

2.      Crossroads provides hospice and palliative care services and support to patients and families coping with end-of-life situations.  Hospice services are covered as part of the Centers for Medicare & Medicaid Services ("CMS") Medicare Part A benefit. Hospice is a program of care

and support for people who are terminally ill that focuses on ensuring patients are comfortable, rather than on curative treatments.

3. This civil action arises from an administrative appeal challenging the Secretary's denial of payment for hospice services associated with nine Medicare beneficiaries that were adjudicated by an ALJ, as well as the use of statistical sampling and extrapolation to determine the alleged overpayment amount in this matter.

## JURISDICTION AND VENUE

4. This action arises under Title XVIII of the Social Security Act (the "Act"), 42 U.S.C. §§ 1395 *et seq.* and involves claims to set aside an unlawful agency final decision that is actionable under the Administrative Procedures Act ("APA") (5 U.S.C. § 706(2)), and Due Process under the United States Constitution, (U.S.C. Const. Amends. 5, 14).

5. Jurisdiction for these claims is proper under 28 U.S.C. § 1331 and 42 U.S.C. § 1395ff.

6. Venue is proper in this judicial district in accordance with 28 U.S.C. § 1391(e), 42 U.S.C. § 1395ff, and 42 C.F.R. § 405.1136(b).

## PARTIES

7. Plaintiff is a Medicare-enrolled hospice provider located at 14310 East 42nd Street, Unit 600, Independence, Missouri, 64055.

8. Defendant, Xavier Becerra, is the Secretary of the United States Department of Health and Human Services ("HHS") and is sued in his official capacity. HHS is the federal agency that administers CMS. CMS is the federal agency to which the Secretary has delegated administrative authority over the Medicare program, which is established under title XVIII of the Act. *See* 42 U.S.C. § 1395 *et seq.* References to the Secretary are meant to refer to him, his

2

subordinate agencies and officials, and to his official predecessors or successors as the context requires.

**LEGAL BACKGROUND**

**A. Medicare Hospice Benefit**

9. Title XVIII of the Act, as amended, 42 U.S.C. §§ 1395-1395lll (the "Medicare statute") establishes a system of health insurance for the aged and disabled. 42 U.S.C. § 1395c. The Provider entered into a written agreement with HHS to provide hospice services to eligible individuals as a "provider of services" under the Medicare statute.

10. The Medicare program is federally funded and is administered by HHS through CMS. 42 U.S.C. § 1395kk. The Medicare Program is made up of four separate parts—Part A, Part B, Part C, and Part D.

11. Medicare Part A refers to the medical insurance program authorized under Part A of Title XVIII of the Act. 42 U.S.C. §§ 1395c, 1395d; 42 C.F.R. § 400.202. Part A covers certain services, including inpatient hospital care, skilled nursing facility care, hospice care, and home health care. 42 U.S.C. § 1395c.

12. Section 1861(dd)(3)(A) of the Act specifies that for purposes of the hospice benefit, an individual is considered to be "terminally ill" if the individual has a medical prognosis that the individual's life expectancy is 6 months or less.

13. Section 1814(a)(7) of the Act specifies that certification of terminal illness for hospice benefits shall be based on the clinical judgment of the hospice medical director or physician member of the interdisciplinary group ("IDG") and the individual's attending physician regarding the normal course of the individual's illness. Accordingly, hospice services are covered if the

services are reasonable and necessary for the palliation or management of the terminal illness and related conditions.

14. Medicare regulations echo the statutory requirement that certification of a qualifying terminal illness "will be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." 42 C.F.R. § 418.22(b).

15. CMS recognizes that predicting life expectancy based on an individual's medical prognosis is not always exact. CMS has stated in crafting the implementing regulations that "[p]redicting life expectancy is not an exact science." 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010); *see also* 79 Fed. Reg. at 50470 ("[W]e also have recognized the challenges in prognostication" and therefore expect "that the certifying physicians will use their best clinical judgment."). While a patient may have a prognosis of living less than six months, they may live longer than expected. CMS does not limit the hospice benefit to a specific number of months. The fact that a Medicare beneficiary lives longer than expected in itself is not cause to terminate benefits. Medicare Benefit Policy Manual ("MPIM") Ch. 9 § 10.

16. Local Coverage Determinations ("LCDs") are guidance documents issued by Medicare Administrative Contractors ("MACs") for the providers in their jurisdictions regarding whether a service is reasonable and necessary. *See* 42 U.S.C. 1395ff(f)(2)(b). In the hospice context, an LCD often applies to specific terminal diagnoses and provides guidance as to qualifications for hospice as to that particular patient's diagnosis.

17. When a hospice provider furnishes services to a Medicare Part A beneficiary, the provider submits a UB-04 claim for reimbursement to its MAC. The MAC then determines whether the hospice services provided are covered and determine any amounts payable and make payment

accordingly. Notification of the MAC's coverage decision is known as an "initial determination." 42 C.F.R. § 405.921.

**B. Overpayment Determinations Using Statistical Sampling and Extrapolation**

18. Federal statute permits the Secretary to enter into contracts with Medicare contractors "for the purpose of identifying underpayments and overpayments and recouping overpayments" with respect to services for which payment is made under the Medicare program. 42 U.S.C. § 1395ddd(h)(1). Initial payment decisions made by Medicare contractors may be audited by Zone Program Integrity Contractors ("ZPICs") (now Unified Program Integrity Contractors ("UPICs")) during post-payment review audits. 42 C.F.R. § 421.304. Post-payment reviews may result in either no change to the initial determination or a revised determination, indicating an underpayment or overpayment. *See* 42 C.F.R. § 405.929.

19. Federal statute also permits the Secretary to establish a standard methodology for Medicare contractors to use sampling and extrapolation in performing their post-payment review duties. 42 U.S.C. § 1395ddd(f)(3),(f)(8).

20. The parameters of the statistical sampling and extrapolation methods permitted are described in the MPIM. Chapter 3 sets forth "[t]he major steps in conducting statistical sampling," and articulates a number of criteria that govern the specifics of each step in the extrapolation process. MPIM Ch. 3, § 3.10.1.3 (Rev. 114, Effective Dec. 8, 2004) (redesignated at MPIM Ch. 8, § 8.4.1.3 effective June 28, 2011). The mandatory steps are summarized as follows:

- Select the provider or supplier;

- Select the period to be reviewed;

- Define the universe, sampling unit, and sampling frame;

- Design the sampling plan and select the sample;

- Review each of the claims or line(s) on the claim and determine if there was an overpayment, or, for administrative reviews, an underpayment; and, as applicable, and

- Estimate the overpayment.

21. For Part A providers, including hospice, reimbursed under Prospective Payment System rates, an MPIM-compliant universe "will consist of all fully and partially paid claims submitted by the provider for the period under review." MPIM Ch. 3, § 3.10.3.2.1.

22. CMS Ruling 86-1 provides that sampling for extrapolation purposes "only creates a presumption of validity as to the amount of an overpayment which may be used as the basis for recoupment." CMS Ruling 86-1 at 11. Following an overpayment determination based on extrapolation, the burden shifts to the Medicare provider or supplier, who "could attack the statistical validity of the sample, or . . . could challenge the correctness of the determination in specific cases identified by the sample[.]" *Id*.

## C. Appeals

23. A Medicare provider that is dissatisfied with the ZPIC post-payment claim denials and resulting MAC determination of an overpayment may engage the administrative appeals process set forth in 42 U.S.C. § 1395ff and 42 C.F.R. Subpart I.

24. A redetermination is the first level of appeal after the initial determination. The MAC performs the redetermination through an independent review of the initial determination. In conducting a redetermination, the MAC reviews the evidence and findings upon which the initial determination was based, and any additional evidence the parties submit or the contractor obtains on its own. *See* 42 C.F.R. § 405.948.

25.     Providers that disagree with the MAC's redetermination decision may request a reconsideration by a Qualified Independent Contractor ("QIC"). A reconsideration consists of an independent, on-the-record review of an initial determination, including the redetermination and all issues related to payment of the claim. In conducting a reconsideration, the QIC reviews the evidence and findings upon which the initial determination, including the redetermination, was based, and any additional evidence the parties submit or that the QIC obtains on its own. If the initial determination involves a finding on whether an item or service is reasonable and necessary for the diagnosis or treatment of illness or injury, a QIC's reconsideration must involve consideration by a panel of physicians or other appropriate health care professionals, and be based on clinical experience, the patient's medical records, and medical, technical, and scientific evidence of record to the extent applicable. *See* 42 C.F.R. § 405.968(a)(1).

26.     Providers that disagree with the reconsideration decision may request a hearing with the Office of Medicare Hearings and Appeals ("OMHA"), typically with an ALJ.

27.      If the request for a hearing asserts disagreement with how a statistical sample and/or extrapolation was conducted, the ALJ is required to base its decision on a review of the entire sample to the extent appropriate to decide the issue. *See* 42 C.F.R. § 405.1032(d)(2).

28.     The ALJ conducts a *de novo* review and issues a decision based on the administrative record, including the hearing record. *See* 42 C.F.R. § 405.1000(d). The ALJ's decision must be based on evidence offered at the hearing or otherwise admitted into the record, and shall include independent findings of fact, conclusions of law, and the reasons for the decision. *See* 42 C.F.R. § 405.1046(a).

29.     ALJs are bound by all laws and regulations pertaining to the Medicare program, including Title XVIII of the Act and applicable implementing regulations. 42 C.F.R. § 405.1063. ALJs are also bound by CMS Rulings.  *Id.*

30.     ALJs are not bound by LCDs or CMS program guidance, but must "give substantial deference to these policies if they are applicable to a particular case." 42 C.F.R. § 405.1062.  If an ALJ declines to follow an applicable LCD or CMS program guidance in a particular case, it "must explain the reasons why the policy was not followed."  *Id.*

31.     ALJs are required to issue decisions that are "written in a manner calculated to be understood by a beneficiary and must include the specific reasons for the determination, including, to the extent appropriate, a summary of any clinical or scientific evidence used in making the determination."  *See* 42 C.F.R. § 405.1046(a)(2).

32.     Where a party is dissatisfied with the ALJ's decision, that party may appeal the ALJ's decision to the Medicare Appeals Council ("Council").  42 U.S.C. § 1395ff(b)(1)(A); 42 C.F.R. §§ 405.1100(a), 405.1102(a)(1).  The Council undertakes a *de novo* review of the ALJ's decision considering all of the evidence in the administrative record.  42 C.F.R. § 405.1100(c).

33.     If the Council does not issue a decision, dismissal or remand within 90 days of the party's request, the appealing party may file a request to escalate the case to a federal district court for judicial review. 42 U.S.C. § 1395ff(d)(3)(B); 42 C.F.R. § 405.1132(a).  In that scenario, the ALJ's decision will act as the final determination of the Secretary.  *See e.g., Prime Healthcare Servs.-Montclair, LLC v. Hargan*, 2018 WL 333862, at *5 (C.D. Cal. Jan. 9, 2018).

**D.  Due Process**

34.     Federal courts have recognized that Medicare Part A beneficiaries and their assignees "have a property interest in coverage under Medicare Part A that is cognizable under the

Due Process Clause." *Barrows v. Becerra*, 24 F.4th 116, 133, 140 (2d Cir. 2022); *see also MedEnvios Healthcare, Inc. v. Becerra*, No. 23-20068-CIV, 2024 WL 1252264, at *3 (S.D. Fla. Mar. 25, 2024), *reconsideration denied*, No. 23-20068-CIV, 2024 WL 3251329 (S.D. Fla. July 1, 2024) (Plaintiff "does have a protected property interest in the funds subject to the extrapolated overpayment demands."); Medicare Claims Processing Manual, CMS Pub. 100-04, Ch. 29 § 110 (defining an "assignee" as a provider or supplier "who has furnished items or services to a beneficiary and has accepted a valid assignment of a claim").

35.     CMS has recognized due process rights associated with statistical sampling and extrapolated overpayment determinations: "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

36.     Federal courts have also recognized that a failure to provide documentation to audited parties to recreate the extrapolation, including each time that an overpayment amount is recalculated, violates procedural due process. *MedEnvios Healthcare, Inc,* 2024 WL 1252264, at *5 (S.D. Fla. Mar. 25, 2024).

## STANDARD OF REVIEW

37.     A reviewing court must set aside agency action held to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence." 5 U.S.C. §§ 706(2)(A), (E). Judicial review under the APA involves questions of law that are reviewed *de novo. See Shalala v. St. Paul–Ramsey Medical Center*, 50 F.3d 522, 527 (8th Cir.1995).

38.     The "substantial evidence" standard examines such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales, 402 U.S. 389, 401* (1971). Substantial evidence "is more than a scintilla but less than a preponderance of the

evidence." *Univ. of Iowa Hosps. & Clinics v. Shalala*, 180 F.3d 943, 954 (8th Cir. 1999). "Review under [the substantial evidence] standard is more than a rubber stamp for the Secretary's decision or a search for the existence of evidence supporting the finding." *Smith v. Heckler*, 735 F.2d 312, 315 (8th Cir. 1984). "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Id*.

## FACTUAL BACKGROUND AND PROCEDURAL POSTURE

### A. Post-payment Review

39. Crossroads submitted claims to Medicare for payment of hospice services for multiple beneficiaries during the period of November 1, 2008, through October 31, 2010. The MAC Palmetto GBA ("Palmetto") initially allowed payment for these services.

40. On June 14, 2011, AdvanceMed, the ZPIC, notified Crossroads that it would reopen claims with dates of service from November 1, 2008 through October 31, 2010. AdvanceMed requested all medical records and supporting documentation from Crossroads for a sample of 30 beneficiaries that included over 400 claims.

41. On May 9, 2013, AdvanceMed notified Crossroads of the results of its post-payment review. In reviewing that sample of 30 beneficiaries, AdvanceMed found that 20 of the 30 beneficiaries had claims that it determined were incorrectly paid under the hospice benefit. Specifically, AdvanceMed determined that the documentation did not support a terminal illness or did not support a medical prognosis that the beneficiary's life expectancy was six months or less if the illness ran its normal course.

42. AdvanceMed determined that the actual amount of overpayment for the claims allegedly paid in error was $914,156.13. AdvanceMed extrapolated its findings to the universe of

claims to determine that Medicare allegedly overpaid Crossroads $8,675,561 during the period November 1, 2008 to October 31, 2010.

43. Palmetto issued an overpayment demand letter in the amount of $8,675,561 on July 8, 2013 based on the conclusions of AdvanceMed.

## B. Redetermination

44. On August 5, 2013, Crossroads requested a redetermination. Crossroads submitted arguments that AdvanceMed's findings were refuted by the documentation in the medical records. Crossroads also challenged the statistical sampling and extrapolation methodologies AdvanceMed used to determine the overpayment amount. Crossroads also argued that it has limited liability and is without fault for the alleged overpayment under Sections 1870(c) and 1879(a) of the Social Security Act.

45. On October 4, 2013, Palmetto issued a partially favorable determination that reduced the number of claim denials from 20 to 15, but did not overturn the extrapolation. AdvanceMed recalculated the extrapolation amount based on the redetermination decision. On November 8, 2013, Palmetto issued a revised demand letter with an alleged overpayment amount of $6,688,564.

## C. Reconsideration

46. Of the fifteen claims that Palmetto denied in its redetermination, Crossroads disputed fourteen of the denials before the QIC. Crossroads again argued that AdvanceMed's and Palmetto's claim-specific findings were refuted by the documentation in the medical records. Crossroads once more challenged the statistical sampling and extrapolation methodologies AdvanceMed used to determine the overpayment amount. Crossroads reiterated its argument that

it has limited liability and is without fault for the alleged overpayment under Sections 1870(c) and 1879(a) of the Social Security Act.

47. On reconsideration, the QIC determined that three claims were fully favorable, two claims were partially favorable, and the remaining nine were unfavorable. The QIC upheld the statistical sampling and extrapolation methodologies used by AdvanceMed. Palmetto issued an amended overpayment demand letter on July 30, 2014, further adjusting the alleged overpayment amount to $4,764,347. AdvanceMed issued an updated extrapolation analysis on September 24, 2014 alleging an extrapolated overpayment of $4,672,979.45.

**D. ALJ Hearing**

48. On September 5, 2014, Crossroads filed an appeal with OMHA, requesting a hearing before an ALJ. Crossroads' request for an ALJ Hearing explained its disagreement with the eleven beneficiary denials that were fully or partially upheld by the QIC. Specifically, Crossroads argued that documentation in the beneficiaries' medical records supports a finding that each beneficiary qualified for hospice care based on the clinical judgment of the treating physician and otherwise met the applicable hospice coverage requirements. Crossroads also argued that AdvanceMed's statistical sampling and extrapolation did not comply with CMS requirements, including, but not limited to, that the sample size was too small, not statistically representative of the patient population, and yielded an unacceptably high degree of imprecision. Crossroads also argued that it has limited liability and is without fault for the alleged overpayment under Sections 1870(c) and 1879(a) of the Social Security Act.

49. Prior to the hearing, and at the ALJ's request, Crossroads filed an independent physician clinical analysis prepared by an independent board-certified physician. The independent physician report specifically assessed each patient with respect to the applicable coverage criteria

and clinical evidence from the medical record. For each beneficiary's case, the independent physician identified whether Palmetto had issued an LCD specific to the beneficiary's disease that was in effect during some, or all, of the beneficiary's dates of service. Specifically, the independent physician identified the following LCDs issued by Palmetto:

a. Palmetto LCD L16343: Hospice – Alzheimer's Disease & Related Disorders, applicable to Beneficiaries 1, 6, 8, and 10.[1]

b. Palmetto LCD L30708: Hospice-Neurological Conditions, applicable to Beneficiaries 3, 5, 7, and 9.

c. Palmetto LCD L6885: Adult Failure to Thrive, applicable to Beneficiary 4.

Palmetto did not have a disease-specific LCD for End Stage Congestive Heart Failure, applicable to Beneficiaries 2 and 11 for the dates of service at issue. In that instance, the independent physician identified LCDs for other MACs that were non-binding yet provided an instructive framework for evaluating Beneficiaries 2 and 11.

50. On November 12, 2021, the ALJ conducted a telephone hearing regarding the substance of the eleven claims at issue. The independent physician and a Crossroads' clinical representative participated in the hearing to demonstrate that the medical record for each patient supported hospice coverage and payment. For each beneficiary, the independent physician explained why each beneficiary qualified for hospice coverage using the clinical criteria identified in each LCD.[2]

---

[1] The ALJ decision refers to the Medicare beneficiaries by number (i.e. Beneficiary 1, Beneficiary 2, etc.). That naming convention is adopted here where applicable.

[2] During the clinical hearing, the ALJ discussed instances where a particular Palmetto LCD became effective some time after the first day of the beneficiary's date of service. In such instances, the ALJ acknowledged that the LCD would be "applicable" if it were in effect at some point during the date range of the dates of service for a beneficiary. Hearing Part I & II, Tr. at 163. The independent physician testified that for evaluating dates of service that included time periods prior to the effective date of the applicable Palmetto LCD, that LCD would nonetheless provide a "frame work" to evaluate the hospice services provided during that date range. *Id*. at 165. On this point, the ALJ proceeded with the understanding of Crossroads' position that the provisions of the LCD that became

51.     Throughout the clinical hearing, the ALJ described his approach to using a generalized checklist to evaluate each case, regardless of the patient's disease and the existence of a Palmetto LCD for that specific disease:

> "[I]n [de]terming whether or not the patient qualifies for a determination of a terminal illness of six months or less, the factors are basically consistent in each case, whether or not the patient had progressive weight loss, whether or not the patient had intractable infections, whether or not the patient suffered from dyspnea, whether the patient suffered from, you know, other conditions such as the decubitus ulcers, whether the patient had swallowing difficulties, whether the patient -- there's a whole list that you go through, a checklist . . ."

Hearing Part III, Tr. at 43-44. The ALJ did not cite any authority for his generalized checklist.

52.     Crossroads also engaged an independent expert statistician to submit a fourteen-page report setting forth arguments as to why the statistical sampling and subsequent extrapolation should be invalidated. Crossroads' expert statistician produced a Statistical Analysis that established arguments for why the ZPIC's statistical sampling, and the ensuing extrapolation, was invalid including:

a.  After multiple favorable findings for Crossroads reduced the "net financial error rate" from 54.6% to 36.9%, the error rate was below the *Medicare Program Integrity Manual*'s (the "*MPIM*") criteria for a "high" error rate of 50% or more.

b.  The sample size of 30 claims was not scientifically rigorous, and made for a non-representative sample.

c.  The individuals and claims that made up the sample did not adequately represent Crossroads' patients, and the ZPIC did not focus on relevant characteristics like length of stay and principal diagnosis.

---

effective at some time after the first day of the beneficiary's date of service "should be considered for [a] particular diagnosis . . . in terms of clinical indications of terminal status." *Id*. at 166.

d.  The ZPIC's reported 45.6% degree of precision was far too high and further demonstrated why the ZPIC's analysis had such a high degree of variability.

53.    On January 12, 2022, the ALJ conducted an additional hearing to address Crossroads' challenge to AdvanceMed's statistical sampling and extrapolation methods.  The independent statistical expert also participated in the hearing, reiterating Crossroads' arguments before the ALJ.  Also present at the hearing was a statistician engaged by OMHA.

54.    On June 29, 2022, the ALJ issued a decision where the ALJ (i) upheld the denial of nine of the eleven beneficiary claims, (ii) upheld AdvanceMed's statistical sampling and extrapolation methodologies, and (iii) found Crossroads liable and without waiver for the overpayment amount under Sections 1870(c) and 1879(a) of the Act.  *See* Attachment A (ALJ Decision).[3]

55.    As of the date of this Complaint, and upon information and belief, Crossroads has not received an updated extrapolation recalculation and supporting documentation from AdvanceMed or an updated overpayment demand letter from Palmetto following the ALJ decision.

**E.  Medicare Appeals Council Review**

56.    Following the ALJ decision, Crossroads filed a request for Council review on August 26, 2022.  To date, the Council has not issued a decision or sent any requests for information.

**F.  Escalation and Judicial Review**

57.    On October 23, 2024, Crossroads notified the Council of its request to escalate its case to federal court pursuant to 42 C.F.R. § 405.1132.  Under this regulation, the Council has 5

---

[3] The ALJ originally issued his decision on May 17, 2022.  The ALJ amended that original decision due to clerical error on June 29, 2022.  The amended decision supersedes the original decision. The amended decision is part of the administrative record. An exceprted version of the amended decision that omits protected health information is included as Attachment A.

calendar days of receiving that request to either issue its decision or send notice that it will not be able to issue a final decision.

58.     Having received no notification from the Council after 5 calendar days of receiving the request to escalate, Crossroads timely filed its complaint seeking judicial review of the ALJ's decision as the Secretary's final agency action on the matter.

59.     Plaintiff calculates the amount in controversy as approximately $5.4 million, exclusive of interest. As of December 2024, Plaintiff estimates the amount in controversy, with interest, to exceed $9 million and growing.

<strong>THE ALJ'S UNLAWFUL DECISION</strong>

60.     The ALJ's decision fails to mention and apply any of the Palmetto LCDs that were identified in the administrative record.  The only reference to LCDs in the decision was a single generalized statement that "[t]he Appellant's documentation failed to demonstrate that each beneficiary had a life expectancy of six months or less to warrant Medicare coverage and payment for hospice services under applicable regulations and local coverage determinations."  ALJ Dec. at 60.

61.     Instead of applying the relevant criteria from Palmetto's disease specific LCDs, the ALJ purportedly applied his own checklist—without any reference or citation—and repeatedly assessed whether the patients' terminal illness or comorbidities "contributed to a progressive decline that supported a terminal illness prognosis of six months or less."  ALJ Dec. at 19, 22, 35, 38, 43, 52, 55, and 58.   This criterion, however, is not included in the applicable Palmetto LCDs or CMS regulations.

62.     The ALJ's decision also reaches an unfavorable disposition for the appeals for Beneficiaries 8 and 9 without providing a complete or comprehensible explanation.   For instance,

the ALJ's decision contains no discussion of Beneficiary 9. *See* ALJ Dec. 43-52 (continuing from Beneficiary 8 to Beneficiary 10). Adding to the confusion, the narrative decision for Beneficiary 8 contains information from dates of service through October 2010, whereas the dates of service for Beneficiary 8 ended in 2009. Only upon a close and careful reading can it be theorized that the ALJ may have confused or merged the narratives for Beneficiaries 8 and 9. Regardless of the nature of the error, the ALJ's rationale is indecipherable and incomplete with respect to supporting the ALJ's conclusion that the hospice services for Beneficiaries 8 and 9 were not reasonable and necessary.

63. The ALJ's decision also contains multiple material errors of fact that are contradicted by the evidence presented to him in the medical record. Below are several examples:

     a. Beneficiary 2: The ALJ alleged that in January 2010, "[t]he Beneficiary had stable congestive heart failure." ALJ Dec. at 18. The medical record shows that the Beneficiary's condition was not stable, as the Beneficiary suffered from difficulty breathing, difficulty walking, and weakened activity tolerance due to the progression of the disease. *See* CrossroadsKC_000001112-14; *see also id*. at 0000001138.[4] The ALJ also alleged that "[t]he record indicates that the Beneficiary suffered from only 'mild' symptoms and received routine care during the dates of service" ALJ Dec. at 18. The symptoms were not mild, however, as evidenced by shortness of breath from minimal exertion, including shortness of breath during conversation. *See* CrossroadsKC_000001178; *see also id*. at 0000001089.

---

[4] Citations to documents with Bates numbering references materials included in the administrative record before the ALJ.

b. Beneficiary 5: The ALJ alleged that the patient exhibited "no indication that the Beneficiary's neurological disease or comorbidities contributed to a progressive decline that supported a terminal illness prognosis of six months or less." ALJ Dec. at 35. The record evidence, however, shows that Beneficiary 5 did demonstrate evidence of decline during the denial period, even though this is not a requirement for hospice coverage. Specifically, for example, Beneficiary 5's Palliative Performance Scale ("PPS") score decreased from 28% to 12% between November 2008 and September 2010. *See* CrossroadsKC_000007689. A PPS of 12% is extremely low, and it would not be clinically expected for a patient's PPS score to decrease further before death. In November 2008, the patient required total care, was non-ambulatory, and was minimally verbal but by 2010 the patient had no purposeful movements and was using only an occasional whisper to communicate.

c. Beneficiary 6: The ALJ alleged that "the Beneficiary did not have any recurrent infection." ALJ Dec. at 38. However, the medical record shows that the patient had 3 infections over a 12-month period. *See* CrossroadsKC_000004179. The ALJ also alleged that the Beneficiary's "only nursing interventions included providing oral Tylenol as needed for arthritic pain, dressing changes for a skin tear, and administering supplemental oxygen for occasional episodes of oxygen desaturation." ALJ Dec. at 38. The patient's nursing interventions were much more extensive, including providing antipsychotic medication for agitation, Ativan for anxiety, and antibiotics for infected teeth. *See*

CrossroadsKC_000004155.  The Beneficiary was also treated by the nurse for blood clots in urine.  *Id*. at 000004185.

d.  Beneficiary 7:  The ALJ alleged that "[d]uring the dates of service, there were no significant changes to the Beneficiary's condition or plan of care" and "[b]y the end of the dates of service, the Beneficiary was in relatively the same condition as the time of the admission."  ALJ Dec. at 43.  The medical record makes clear, however, that the Beneficiary did experience significant health changes and progressive decline during the dates of service including weight loss, decreased mobility, bowel and bladder incontinence, multiple infections, and continued cognitive decline.  *See* CrossroadsKC_000008520.

e.  Beneficiary 10:  The ALJ alleged that "by the end of the dates of service, the Beneficiary had gained 1.6 pounds from the date of admission, when she weighed 144 pounds."  ALJ Dec. at 55.  In fact, the patient's weight declined from 154.7 pounds at admission to 145.6 pounds by the end of the dates of service.  *See* CrossroadsKC_000001800.  The ALJ also alleged that the patient exhibited "no indication that the Beneficiary's end-stage dementia or comorbidities contributed to a progressive decline that supported a terminal illness prognosis of six months or less."  ALJ Dec. at 55.  Notwithstanding that progressive decline is not required for hospice coverage, the ALJ's finding is contradicted by the record evidence.  For example, Beneficiary 10's Nursing Comprehensive Assessment Monthly Update shows an ICF assessment score of 41, indicating "Severe Debilitation/Decline."  CrossroadsKC_0000001997-98 (also providing a narrative of declining condition).  She also required oxygen

and had several UTIs as well as active lung disease and respiratory issues. Beneficiary 10 passed away less than 7 months following the dates of service denied.

f.  Beneficiary 11:  The ALJ alleged that "[t]hough the Beneficiary complained of weakness and fatigue during the dates of service, no physician orders or intervention were required during the time period in dispute"  ALJ Dec. at 58. The medical record shows, however, that the physician ordered Vicoprofen for pain management during the dates of service.  *See* CrossroadsKC_000000840.

64.  The ALJ's decision with respect to Crossroads' challenge to the statistical validity of the ZPIC's sampling and extrapolation methods is also flawed.   The 14-page report and expert testimony by Crossroads' expert statistician were disregarded by the ALJ, as his analysis on each point amounted to nothing more than a vague, conclusory, single-paragraph response on each point raised by Crossroads, including that the sample lacked representativeness.   On the point of representativeness, for instance, the ALJ concluded that Crossroads' argument is "without merit" because it "fails to take into account all of the other factors that are involved in the sample design." ALJ Dec. at 9.  But the ALJ provides no meaningful explanation as to why those factors are relevant and sufficient to overcome the lack of representativeness in the sample.

## CAUSES OF ACTION

### COUNT I
### Violation of the APA (5 U.S.C. § 706(2))

65.  Plaintiff hereby incorporates by reference paragraphs 1 through 64.

66.  Under 5 U.S.C. § 706(2)(a), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

67.     While the Secretary's regulations specify that ALJs are not bound by LCD, they affirmatively require ALJs to "give substantial deference" to LCDs "if they are applicable to a particular case."  42 C.F.R. § 405.1062(a).

68.     An ALJ that "declines to follow" an applicable LCD in a particular case "must explain the reasons why the policy was not followed."  42 C.F.R. § 405.1062(b).

69.     Crossroads, through an independent board-certified physician, presented evidence to the ALJ that specifically assessed the applicable disease-specific Palmetto LCDs, demonstrating that the patients met the relevant Palmetto LCD criteria for their unique terminal diagnoses.

70.     The ALJ's decision does not apply the proper legal standard. The ALJ decision fails to mention any of Palmetto's LCDs or apply any of their criteria.  The lone reference to LCDs generally in the decision was a single statement that "[t]he Appellant's documentation failed to demonstrate that each beneficiary had a life expectancy of six months or less to warrant Medicare coverage and payment for hospice services under applicable regulations and local coverage determinations."  ALJ Dec. at 60.

71.     By failing to engage with, or even reference, the applicable Palmetto LCDs, the ALJ's decision necessarily "declines to follow" the applicable LCDs.  42 C.F.R. § 405.1062(b). The ALJ was, therefore, required to "explain the reasons why the [applicable LCD] was not followed."  *Id*.   The ALJ failed to comply with this straightforward requirement of 42 C.F.R. § 405.1062.  This Court can be guided by similar conclusions reached by the Council in finding that an ALJ violates 42 C.F.R. § 405.1062 when the "ALJ's decision does not reflect that the ALJ considered the LCD in reaching her findings. The ALJ does not mention the LCD or its requirements in the Findings of Fact, Principles of Law (although the ALJ provides a brief discussion of general Medicare regulations concerning LCDs), Analysis, or Conclusions of Law."

*In the Case of Caris MPI, Inc.*, HHS Departmental Appeals Board, Medicare Appeals Council, M-12-648, CCH ¶122,917 (April 24, 2012). So too here. The ALJ neither mentioned any of the Palmetto LCDs, nor provided an explanation as to why he did not follow those LCDs.

72. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

**COUNT II**
**Violation of the APA (5 U.S.C. § 706(2))**

73. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

74. Under 5 U.S.C. § 706(2)(a), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

75. There is no Medicare authority that permits an ALJ to apply a different MAC's LCD or establish their own clinical criteria for coverage determinations in place of applicable LCDs. ALJ decisions have been reversed on appeal for applying a different MAC's LCD when the appropriate MAC's LCD was applicable. *See, e.g., In the Case of Vitas Innovative Hospice Care*, 2009 WL 5764305, Nov. 9, 2009 ("We find, however, that the ALJ erred in applying LCD L13653, Hospice - Determining Terminal Status. Dec. at 5-8. The contractor who issued that LCD was Cahaba GBA, LLC - Midwest. LCD L13653. The contractor in this case is Palmetto GBA."). Similarly, an ALJ's failure to correctly apply the provisions of the applicable LCD "is a sufficient basis for reversing the ALJ's decision." *In the Case of Midland Care Connection, Inc.*, 2013 WL 8691428 (May 23, 2013); *see also In the Case of Hearts for Hospice*, 2011 WL 6901380 (Apr. 18, 2011)(the Council reversed the ALJ decision when "the Part III analysis [of L25678] was not included in the ALJ's written decision.").

76. Instead of applying the applicable Palmetto LCDs, the hearing transcript reveals that the ALJ inappropriately applied his own general "checklist." Hearing Part III, Tr. at 43-44. Upon information and belief, the criteria utilized by the ALJ regarding his "checklist" mirrors the criteria in *different* MAC LCDs. Nearly all of the elements of the ALJ's checklist correspond to CGS Administrators, LLC LCD L34538, Hospice Determining Terminal Status, as well as Cahaba GBA LCD L13653, Determining Terminal Status. Neither of those LCDs were issued by Palmetto and cannot supplant the criteria established in the Palmetto LCDs.

77. Upon information and belief, the ALJ's checklist included incontinence, dependence on activities of daily living, intractable infections (e.g., UTIs), weight loss, dysphasia with increasing respiratory rate, intractable coughing, nausea, vomiting, diarrhea, pain issues, decline in blood pressure, change in level of consciousness, hospitalizations, pressure ulcers, edema and other factors. These factors align with the "non-disease specific decline in clinical status guidelines" from Cahaba's L13653, which nearly identically resembles the ALJ's application of his own checklist.

78. The ALJ's application of his own generalized checklist, effectively applying the LCD of a different MAC, when an applicable LCD issued by Palmetto existed for the specific disease at issue, is sufficient grounds to reverse the ALJ's decision. *See, e.g., In the Case of Vitas Innovative Hospice Care*, 2009 WL 5764305, Nov. 9, 2009.

79. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

## COUNT III
### Violation of the APA (5 U.S.C. § 706(2))

80. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

81. Under 5 U.S.C. § 706(2)(a), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

82. As a result of applying his own generalized checklist rather than the appropriate disease-specific LCDs, including those LCDs issued by Palmetto, the ALJ erroneously applied Medicare criteria for the hospice benefit.

83. For example, through his analysis, the ALJ repeatedly assessed whether the patients' terminal illness or comorbidities "contributed to a ***progressive decline*** that supported a terminal illness prognosis of six months or less." ALJ Dec. at 19, 22, 35, 38, 43, 52, 55, and 58 (emphasis added). It appears that the ALJ imported the concept of progressive decline from LCDs from other contractors which are not applicable to Crossroads, including Cahaba GBA LCD L13653. This criterion, however, is not included in the applicable Palmetto LCDs or CMS regulations and is not applicable to Crossroads. *See In the Case of Hospice of the Red River Valley*, 2010 WL 7342903 (Dec. 15, 2010) (the Council reversed the ALJ's denial when it found the patient's "condition met and exceeded the LCD guidelines for determining terminal status for hospice care" and the "ALJ did err in requiring that the appellant also demonstrate that the beneficiary had had a recent decline in clinical status" as it was not required by the applicable LCD.)

84. The ALJ's assessment of whether the patient exhibited "progressive decline" also directly contradicts CMS's position as expressed in agency rulemaking. CMS "acknowledge[s] that at recertification, not all patients may show measurable decline." 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009); *see also* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

85. By way of another example, the ALJ regularly assessed whether a patient exhibited weight loss or weight gain as a clinical criteria to support his denials. *See e.g.,* ALJ Dec. at 15, 35.

The Palmetto LCDs applicable to the claims at issue, however, do not contain weight loss or gain as a criterion.

86.     CMS regulations and the Palmetto LCDs at issue do not require the type of factors relied upon by the ALJ such as progressive decline, weight loss, and others. Thus, the ALJ's emphasis on these factors to support the denials is inappropriate.

87.     For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law and unsupported by substantial evidence.

## COUNT IV
### Violation of the APA (5 U.S.C. § 706(2))

88.     Plaintiff hereby incorporates by reference paragraphs 1 through 64.

89.     Under 5 U.S.C. § 706(2)(a), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

90.     Medicare statute and regulations require that certification of a qualifying terminal illness for purposes of the hospice benefit will be "based on the physician's or medical director's clinical judgment regarding the normal course of the *individual's illness*."  42 U.S.C. § 1395f(a)(7) (emphasis added); *see also* 42 C.F.R. § 418.22(b).

91.     Here, the nine patients at issue had six different terminal diagnoses: End Stage Congestive Heart Failure, End Stage Multiple Sclerosis, End Stage Alzheimer's Dementia, End Stage Neurological Condition of Anoxic Encephalopathy, End Stage Dementia, and End Stage Parkinson's Disease.

92.     Instead of assessing hospice eligibility under the relevant Medicare standard to assess the individual's illness, the ALJ arbitrarily applied his own hospice eligibility criteria in the

same manner for all nine patients regardless of whether the patient was dying from multiple sclerosis, heart failure, or Alzheimer's. This is evident from the ALJ's statement during the hearing:

> "[I]n [de]terming whether or not the patient qualifies for a determination of a terminal illness of six months or less, the *factors are basically consistent in each case*, whether or not the patient had progressive weight loss, whether or not the patient had intractable infections, whether or not the patient suffered from dyspnea, whether the patient suffered from, you know, other conditions such as the decubitus ulcers, whether the patient had swallowing difficulties, whether the patient -- there's a whole list that you go through, a checklist . . ."

93.     The generalized "factors" relied upon by the ALJ do not assess whether the patients at issue met the certification requirements for hospice care based on the "normal course of the *individual's illness*." 42 U.S.C. § 1395f(a)(7) (emphasis added). For instance, one of the elements in the ALJ's checklist is "intractable infections." Assessing whether a patient has an intractable infection and using that factor as dispositive of hospice coverage fails to acknowledge that such a factor may have little or no relevance depending on the patient's diagnosis and current status.

94.     For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

## COUNT V
### Violation of the APA (5 U.S.C. § 706(2))

95.     Plaintiff hereby incorporates by reference paragraphs 1 through 64.

96.     Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

97.     Medicare statute requires that certification of a qualifying terminal illness for purposes of the hospice benefit will be "based on the *physician's or medical director's clinical*

*judgment* regarding the normal course of the individual's illness." 42 U.S.C. § 1395f(a)(7) (emphasis added); *see also* 42 C.F.R. § 418.22(b).

98. The Supreme Court's holding in *Loper Bright Enterprises v. Raimondo* requires courts to "independently interpret" the statute to determine its "best meaning." 144 S. Ct. 2244, 2266 (2024).

99. The hospice statute and implementing regulations have been interpreted to mean that "a patient is eligible for the Medicare hospice benefit if the appropriate physician makes a clinical judgment that the patient is terminally ill in light of the patient's complete medical picture, as evidenced by the patient's medical records." *United States v. AseraCare, Inc.*, 938 F.3d 1278, 1293 (11th Cir. 2019) (examining the hospice statute and regulation under a False Claims Act theory but nonetheless providing instructive guidance on the question of hospice eligibility under Medicare). "Importantly, none of the relevant language states that the documentary record underpinning a physician's clinical judgment must prove the prognosis as a matter of medical fact." *Id*. "Nor does this framework state or imply that the patient's medical records must unequivocally demonstrate to an unaffiliated physician, reviewing the records after the fact, that the patient was likely to die within six months of the time the certifying physician's clinical judgment was made. Rather, the framework asks a physician responsible for the patient's care to exercise his or her judgment as to the proper interpretation of the patient's medical records." *Id*. at 1294. To put it plainly, "the physician's clinical judgment dictates eligibility as long as it represents a reasonable interpretation of the relevant medical records." *Id*. "More broadly, CMS's rulemaking commentary signals that well-founded clinical judgments should be granted deference." *Id* at 1295.

100. Here, the ALJ's generalized-checklist-approach to examining the medical record fails to follow Congress's legislative directive to account for, or give deference to, the clinical judgement that the beneficiaries' treating physician used to certify the hospice eligibility. The ALJ's unfavorable dispositions are based on his own conclusions that the medical record does not show, according to the ALJ, that the patient was terminally ill during the dates of service. But this type of after-the-fact analysis of whether the medical record unequivocally demonstrates that a patient is terminally ill is not the appropriate inquiry under the clear meaning of the statute under *Loper Bright* or the guidance offered by *AseraCare.* Rather, the ALJ must assess whether the physician's clinical judgments at the time are well-founded and reasonable. *Id*. The ALJ failed to do that here. Instead, the ALJ simply substituted his generalized checklist of symptoms for that of the treating physician's clinical judgment. The ALJ's use of an unpublished, unauthoritative checklist in this manner does not align with the standard for determining hospice eligibility and violates the meaning of the hospice eligibility criteria under the Medicare statute.

101. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

**COUNT VI**
**Violation of the APA (5 U.S.C. § 706(2))**

102. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

103. Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

104. When an ALJ's decision "was based largely on [] factual errors" courts "cannot say that it is supported by substantial evidence." *Horan v. Astrue*, 350 F. App'x 483, 485 (2d Cir. 2009); *see also Pratts v. Chater*, 94 F.3d 34, 37-38 (2d Cir.1996) (finding substantial evidence did not

support the ALJ's decision where, inter alia, the ALJ made several factual errors in evaluating the medical evidence).

105.     Here, the ALJ's decision contains multiple factual errors. *See supra* at ¶ 64.  These factual errors are not harmless.  Rather, they are material to the ALJ's analysis for determining that hospice care was not reasonable and necessary in each case.

106.     For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

**COUNT VII**
**Violation of the APA (5 U.S.C. § 706(2))**

107.     Plaintiff hereby incorporates by reference paragraphs 1 through 64.

108.     Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

109.     ALJs are required under regulation to issue a decision that is "written in a manner calculated to be understood by a beneficiary and must include—(i) the specific reasons for the determination, including, to the extent appropriate, a summary of any clinical or scientific evidence used in making the determination."  42 C.F.R. § 405.1046(a)(2).

110.     ALJ decisions have been reversed when "the ALJ's decision did not fully address the appellant's claim for coverage of inpatient hospital services and did not consider the full range of applicable Medicare Part A coverage authorities." *In the Case of Grant Medical Center* v. *National Government Services*, 2013 WL 8744691 (HHS Dept. App. Bd. 2013) (citing 42 C.F.R. § 405.1046(b)).

111.     The ALJ has violated this regulatory requirement by issuing an indecipherable analysis for Beneficiary 8 and no analysis of Beneficiary 9.  Indeed, by failing to include

information for Beneficiaries 8 and 9, the ALJ issued a decision that is not consistent with the regulation.

112.     For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

**COUNT VIII**
**Violation of the APA (5 U.S.C. § 706(2)); Violation of Due Process  (U.S.C. Const.Amends. 5, 14.)**

113.     Plaintiff hereby incorporates by reference paragraphs 1 through 64.

114.     Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

115.     "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

116.     The ALJ found no merit to Crossroads' argument that AdvanceMed's samples size of 30 was too small and not rigorous enough to achieve valid results, which led to a non-representative sample and an unacceptable degree of precision.  ALJ Dec. at 9-10.  The  ALJ's analysis, however, fails to engage with the myriad support for these challenges by Crossroads' expert statistician.

117.     Crossroads' expert statistician submitted a 14-page report and testified before the ALJ during the hearing alleging that the sample was too small, lacked representativeness, and yielded an unacceptable degree of precision.  Yet, these substantive arguments were disregarded by the ALJ, as his analysis on each point amounted to conclusory and vague single-paragraph responses on each issue.

118.     While the MPIM does not mandate a minimum sample size, it acknowledges that not one single sample size should apply to all situations.  "It is neither possible nor desirable to specify a minimum sample size that applies to all situations. A determination of sample size may take into account many things, including the method of sample selection, the estimator of overpayment, and prior knowledge (based on experience) of the *variability of the possible overpayments* that may be contained in the total population of sampling units."  MPIM Ch. 3 § 3.10.4.3 (emphasis added).

119.     As described in Crossroads' expert statistician report, AdvanceMed's stated reason for choosing a sample size of only 30 units was their reliance on a publication that argues such small sample sizes are acceptable, in certain circumstances.[5]  Crossroads' expert showed that a closer reading of that publication, however, explains how those conclusions are limited to payment populations that are "relatively homogeneous," which is not the case for Crossroads.  For example, Crossroads treated patients with 69 distinct principal terminal diagnoses during the audited timeframe. However, AdvanceMed's small sample captured less than 25% of those terminal diagnoses. In other words, 75% of the terminal diagnoses treated by Crossroads were not considered at all as part of AdvanceMed's audit, yet the alleged overpayment was extrapolated to a universe containing those non-audited terminal diagnoses.

120.     In response to Crossroads' challenge to AdvanceMed's sample size, the ALJ gives a short-shrift statement that the MPIM does not mandate a minimum sample size, and limitations to the sample size do not invalidate the overpayment "so long as proper procedures for the execution

---

[5] Edwards *et. al*. The Minimum Sum Method: A Distribution-Free Sampling Procedure for Medicare Fraud investigations: Health Services and Outcomes Research 4, 2003.

of probability sampling have been followed." ALJ Dec. at 9. This conclusory statement fails to engage with Crossroads' expert report and makes no factual findings supporting that conclusion.

121. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

122. For these same reasons, the ALJ's decision to uphold the extrapolation violates Crossroads' right to Due Process.

## COUNT IX
### Violation of the APA (5 U.S.C. § 706(2)); Violation of Due Process (U.S.C. Const.Amends. 5, 14.)

123. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

124. Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

125. "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

126. "Absent an explicit provision in the statute that requires individualized claims adjudications for overpayment assessments against providers, the private interest at stake is easily outweighed by the government interest in minimizing administrative burdens; in light of the fairly *low risk of error so long as the extrapolation is made from a representative sample* and is statistically significant, the government interest predominates." *Chaves Cnty. Home Health Serv., Inc. v. Sullivan*, 931 F.2d 914, 922 (D.C. Cir. 1991)(emphasis added).

127. The lack of representativeness of the sample as compared to the universe of relevant claims also invalidates the AdvanceMed's sampling methodology and militates extrapolation. AdvanceMed's extrapolation memorandum within the administrative record explains that

"sampling is a technique designed to produce a subset of elements that represents the characteristics of a population."  SAS-SSOE Memo, dated April 9, 2012, p 2.

128.     AdvanceMed failed to evaluate relevant characteristics for representativeness, such as length of stay or diagnosis code, as those characteristics directly affect the likelihood and amount of potential overpayments.  Crossroads' expert explained that an overwhelming 75% of the principal diagnoses treated by Crossroads were not reflected in the sample at all, and the one that were selected were disproportionately represented. For example, Diagnosis 340 – Multiple Sclerosis comprised less than 2% of the total Crossroads population, however it made up more than 10% of AdvanceMed's sample. Similarly, Diagnosis 2900 – Dementia, comprised almost 30% of the total Crossroads population, however it made up only 13% of AdvanceMed's sample.

129.     In response to Crossroads' challenge to the lack of representativeness in AdvanceMed's sample, the ALJ's three-sentence statement gives no analysis of Crossroads' arguments, including its expert report, and parrots an excerpt from the manual regarding sample size.  ALJ Dec. at 9.  Moreover, the ALJ purportedly relies exclusively on the OMHA statistician's testimony that while the sample could have been better designed, e.g., stratified by medical conditions, the sample met the bare minimum of just "good enough" to be valid.  ALJ Dec. at 9. The OMHA statistician's report, however, makes no assertion that AdvanceMed's sample was representative.  In fact, the OMHA statistician's report only vaguely asserts that the sampling "*appears* to be consistent with the guidance in the Program Integrity Manual."

130.     The lack of analysis from the ALJ, along with the lack of support from the OMHA statistician, regarding the lack of representativeness in the sample fails to provide more than the "mere scintilla" needed to meet the substantial evidence standard.  *Richardson v. Perales*, 402 U.S.

389, 401 (1971). Here, the relevant evidence, as a reasonable mind might accept as adequate, is not enough to support the conclusion reached by the ALJ.

131. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

132. For these same reasons, the ALJ's decision to uphold the extrapolation violates Crossroads' right to Due Process.

### COUNT X
### Violation of the APA (5 U.S.C. § 706(2)); Violation of Due Process (U.S.C. Const.Amends. 5, 14.)

133. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

134. Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

135. "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

136. Designing the sample plan and selecting the sample is one of the key steps AdvanceMed was required to follow in conducting statistical sampling. *See* MPIM Ch. 3 § 3.10.1.3. A common function in designing the sampling plan is to define the parameters to achieve valid results. In analogous examples, TRICARE's sampling guidance requires parameters of a 90% confidence interval and coefficient of variance of no greater than 5%.[6] The HHS OIG requires parameters of 90% and 25% respectively.[7]

---

[6] TRICARE Operations Manual 6010.59-M, Chapter 13, Figure 13.A-5, April 1, 2015.
[7] HHS OIG: Corporate Integrity Agreement FAQs, CIA Claim Reviews.

137. A review of AdvanceMed's audit worksheets by Crossroads' expert statistician showed no evidence of it contemplating desired levels of statistical precision or confidence specifications, which are common considerations when determining an adequate sample. Crossroads' expert statistician concluded that AdvanceMed did not perform these calculations and therefore had no way of knowing whether its conclusions based on a sample of 30 units would be too imprecise to be useful for its intended purpose before executing the sample. Even OMHA's statistician conceded during the ALJ Hearing "[t]hat imprecision that we're talking about, you know, as a scientist, you know, it appalls me. I'd never tolerate it in my research work." Hearing Part III, Tr. at 61.

138. Despite evidence of this design failure—which yielded an unacceptably high degree of imprecision at plus/minus 46% at the time of the ALJ's review—the ALJ erroneously concluded that "the probability sample design was properly executed, thus it is statistically valid." The ALJ failed to engage with the overwhelming evidence that AdvanceMed's sample lacked the design requirements to be valid.

139. An additional procedural failure in AdvanceMed's sampling methodology is that it followed the incorrect version of the MPIM. Through its sampling methodology documentation, AdvanceMed cited to policies and procedures located in Chapter 8 of the MPIM, which became effective in 2011. The scope of AdvanceMed's audit pertained to hospice services with dates of service November 1, 2008 through October 31, 2010. According to the ALJ, "Because the sampling guidelines were located in Chapter 3 of the MPIM at the time the sampling at issue was conducted, this ALJ cites to the provisions in Chapter 3 rather than to their newer Chapter 8 locations." ALJ Dec. at 6.

140. Despite the ALJ's own admission that Chapter 3 rather than Chapter 8 of the MPIM applied to Crossroads' case, he incorrectly found no fault in AdvanceMed using the wrong version of the sampling requirements in supporting their audit.

141. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, and unsupported by substantial evidence.

142. For these same reasons, the ALJ's decision to uphold the extrapolation also violates Crossroads' right to Due Process.

**COUNT XI**
**Violation of the APA (5 U.S.C. § 706(2)); Violation of Medicare Statute (42 U.S.C. § 1395hh(a)(2)); Violation of Due Process (U.S.C. Const.Amends. 5, 14.)**

143. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

144. Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

145. The Medicare statute requires the Secretary to subject any rules, requirements, or other policy statements that impact a provider's payment to notice-and-comment rulemaking. 42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).

146. "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

147. As applicable to hospice providers, "the universe of claims from which the sample is selected will consist of all fully and partially paid claims submitted by the provider for the period under review. Sampling units with *no final payment made at the time of sample selection* should not be included in the sampling frame. Claims with no payment may be included in the universe from which the sampling frame is constructed and should be excluded when establishing the

sampling frame." MPIM Ch. 3, § 3.4.3.2.1 (emphasis added). In this context, the claims that are to be excluded from the sampling frame are only those claims that have not yet been adjudicated with a payment determination. The term "partially and fully paid" claims, therefore, includes claims that have been adjudicated and received a payment amount of zero dollars.

148. Here, AdvanceMed excluded claims from the sample frame where a final payment was made in the amount of zero dollars. This failure to include claims that were adjudicated by the MAC but were paid zero dollars leads to a statistical sampling that is biased against the provider and causes the extrapolated demand to be exaggerated in favor of overpayments compared to underpayments.

149. The ALJ's endorsement of the statistical validity of the sample and the resulting extrapolation is logically inconsistent with the policy described in the MPIM. In interpreting the phrase "fully and partially paid claims," the MPIM, excludes claims from the sampling frame only "when no final payment was made at the time of sample selection." AdvanceMed, on the other hand, excludes claims that were paid at the time of the sample selection but were paid the amount of zero dollars. By endorsing AdvanceMed's method as valid, the ALJ highlights inconsistent treatment, without a reasonable explanation, regarding the Secretary's position on the meaning of "fully and partially paid claims" that inflates the alleged overpayment liability for Crossroads. *See Walter O. Boswell Mem'l Hosp., v. Heckler*, 749 F.2d 788, 799 (D.C. Cir. 1984) ("It would be arbitrary and capricious for [the Secretary] to bring varying interpretations of the statute to bear, depending upon whether the result helps or hurts Medicare's balance sheets").

150. To the extent that the Secretary seeks to interpret "fully and partially paid claims" as excluding those claims fully adjudicated but paid zero dollars, such an interpretation seeks to implement a substantive legal rule that failed to undergo notice-and-comment rulemaking as

required by the Medicare statute.  42 U.S.C. § 1395hh(a)(2); *Azar v. Allina Health Servs.*, 139 S. Ct. 1804 (2019).

151.    For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, unsupported by substantial evidence, and violative of the Medicare statute's notice-and-comment rulemaking requirements.

152.    For these same reasons, the ALJ's decision to uphold the extrapolation also violates Crossroads' right to Due Process.

**COUNT XII**
**Violation of the APA (5 U.S.C. § 706(2)); Violation of Due Process  (U.S.C. Const.Amends. 5, 14.)**

153.    Plaintiff hereby incorporates by reference paragraphs 1 through 64.

154.    Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

155.    The Medicare statute permits the Secretary to enter into contracts with Medicare contractors "for the purpose of identifying *underpayments and overpayments* and recouping overpayments" with respect to services for which payment is made under the Medicare program. 42 U.S.C. § 1395ddd(h)(1).

156.    "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

157.    Here, AdvanceMed excluded claims from the sample frame where a final payment was made in the amount of zero dollars, effectively eliminating any possibility of AdvanceMed including any potential claims in the sample that could have been identified as an underpayment to Crossroads.  This failure to include claims that were adjudicated by the MAC but were paid zero

dollars leads to a statistical sampling that is biased against the provider and causes the extrapolated demand to be exaggerated in favor of overpayments compared to underpayments. Said another way, the calculated overpayment amount could have been lower because claims that should have been paid but were not would have necessarily lowered the net overpayment.

158. The ALJ's endorsement of the statistical validity of the sample and the resulting extrapolation is at odds with Congress's directive in the Medicare statute for the ZPIC to identify both *underpayments and overpayments* for the purposes of recouping overpayments. *See* 42 U.S.C. § 1395ddd(h)(1). The Secretary is not afforded deference to interpret this statutory phrase contrary to its clear meaning. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2270, 219 L. Ed. 2d 832 (2024) (tasking courts with exercising their independent judgment to determine the best reading of the statute).

159. For these reasons, the ALJ's decision is arbitrary, capricious, an abuse of discretion, not in accordance with law, unsupported by substantial evidence, and violative of the Medicare statute's notice-and-comment rulemaking requirements.

160. For these same reasons, the ALJ's decision to uphold the extrapolation also violates Crossroads' right to Due Process.

## COUNT XIII
## Violation of Due Process  (U.S.C. Const.Amends. 5, 14.)

161. Plaintiff hereby incorporates by reference paragraphs 1 through 64.

162. Under 5 U.S.C. § 706(2)(a), (e), "[t]he reviewing court shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and "unsupported by substantial evidence."

163. "Sampling does not deprive a provider of its rights to challenge the sample, nor of its rights to procedural due process." CMS Ruling 86-1 at 11.

164.     The ALJ issued a partially favorable decision on June 29, 2022.  Crossroads did receive a refund of approximately $400,000 after the ALJ's decision. Palmetto and AdvanceMed, however, failed to recalculate and re-extrapolate the alleged overpayment.  Similarly, upon information and belief, Crossroads was never provided with any documentation to support the recalculated overpayment following the ALJ's decision and was, therefore, unable to recreate the recalculations to verify the revised extrapolated amounts.

165.     For these reasons, the Secretary has violated Crossroads' right to Due Process.

## REQUEST FOR RELIEF

Plaintiff requests an Order:

    a. Reversing the ALJ's decision for each of the nine beneficiaries;

    b. Invalidating extrapolation;

    c. Directing the Secretary to refund all improperly recouped amounts including applicable interest;

    d. Declaring that Plaintiff has limited liability and is without fault for the alleged overpayment under Sections 1870(c) and 1879(a) of the Act; and

    e. Providing such other relief as the Court may consider appropriate.


Dated: December 20, 2024

Respectfully submitted,

**GRAVES GARRETT GREIM LLC**

*/s/ Todd P. Graves*
Todd P. Graves, Bar. No. 41319
Paul E. Brothers, Bar No. 68704
1100 Main Street, Suite 2700
Kansas City, MO 64105
TGraves@gravesgarrett.com
pbrothers@gravesgarrett.com


*Pro Hac Vice (Admission Forthcoming)*

Michael LaBattaglia, D.C. Bar No. 1601580
KING & SPALDING LLP
1700 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C.  20006
MLaBattaglia@kslaw.com


*Attorneys for Plaintiff*